FILED
GREAT FALLS DIV.

2008 AUG 7 PM 3 49

PATRICK E. DUFFY, CLERK

IN THE UNITED STATES DISTRICT COURT _____

DEPUTY CLERK

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

| | |
|---|---|
| WILLIAM N. WEBER, M.D., | CV 02-10-H-SEH |
| **Plaintiff,** | |
| **vs.** | **FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER**[2] |
| JAMES B. PEAKE, M.D.[1], SECRETARY OF VETERANS' AFFAIRS, | |
| **Defendant.** | |

This matter was tried to the Court on September 22 and 23, 2005, the Honorable Sam E.

Haddon presiding. The plaintiff was represented by Bruce M. Spencer, Smith Law Firm, P.C.

The defendant was represented by Lori Harper Suek, Assistant United States Attorney.

Oral testimony was presented and documentary evidence received. From the record, the

Court makes the following:

---

[1] James B. Peake, M.D. was nominated by President George W. Bush to serve as Secretary of Veterans' Affairs on October 30, 2007, and was unanimously confirmed by the Senate on December 14, 2007. He was sworn into office on December 20, 2007.

[2] These Findings of Fact and Conclusions of Law and Order replace the Findings of Fact and Conclusions of Law and Order entered on November 15, 2005.

1

## FINDINGS OF FACT

1. Plaintiff William N. Weber, M. D., ("Weber") was a resident of the state of Montana at the time of the allegations in the third amended complaint.

2. Defendant James B. Peake, M.D. is the Secretary of the Department of Veterans Affairs and is required by law to be named in this action.

3. The Department of Veterans' Affairs is an executive agency.

4. Veterans' Administration Medical and Regional Center (hereafter VAMC), located at Fort Harrison, Lewis and Clark County, is located within the Helena Division of the District of Montana, United States District Court.

5. Weber was over 40 years of age during all events in the third amended complaint. **Transcript of Bench Trial Proceedings, September 22-23, 2005, ("RT")170 at 5-8.**

6. On June 5, 1997, Weber was interviewed for the position of staff radiologist at the VAMC. Among others, he was interviewed by Dr. Louis Arvanetes ("Arvanetes"). **RT 16 at 19-25; 17 at 1-5; 61 at 19-25; 62 at 1-11; 169 at 15-25; 170 at 1-2.** Arvanetes explained in detail the requirements of the job, including the MRI procedure. **RT 176 at 5-25; 177 at 1-21.** Weber assured Arvanetes that he could perform all aspects of the job, including MRI. **RT 63 at 4-25; 64 at 1-8.**

7. Arvanetes also talked with Weber about the age difference between them and whether Weber would have a problem working with him as a supervisor, since Arvanetes is younger than Weber. **RT 16 at 21-25; 17 at 1-5.** Weber implied during his testimony that this statement by Arvanetes is evidence of age discrimination.

2

8.      Weber referenced the discussion with Arvantes twice during his testimony. The references differ drastically and materially. Initially, he agreed with Arvanetes' recollection of the statement – essentially, Arvanetes asked him if he would have a problem with the age difference. **RT 169 at 15-25; 170 at 1-2.** The second time, however, he stated that Arvanetes said "he would be uncomfortable hiring an older physician." **RT 260 at 24-25; 261 at 1-4.** Arvanetes in substance denied the second statement was ever made by him. **RT 16 at 19-25; 17 at 1-9.**

9.      Weber's differing accounts of the above discussion calls his credibility into question. The Court finds the discussion was nothing more than an attempt by Arvanetes to ensure that Weber would not have a problem working for a younger doctor and warrants no finding of an inference of age discrimination. Weber was tentatively offered the position. **RT 177 at 25; 178 at 1-10.**

10.     On October 1, 1997, Weber was given a temporary appointment (not to exceed 13 months) with the VAMC. He began employment on October 2, 1997. **Trial Exhibit 99.** The appointment was designated as temporary by the Professional Standards Board because the Board had received an insufficient number of references. A review of the temporary appointment, pending receipt of additional references, was scheduled for December 1, 1997. **Trial Exhibits 23 and 24.**

11.     Weber was converted to a full-time probationary staff radiologist on December 1 1997. The probationary status was for a two-year period. **Trial Exhibit 25.** Arvanetes, as chief of the radiology department, was Weber's immediate supervisor.

3

12.     Arvanetes limited Weber's work load initially to allow Weber to adjust to the work environment. Arvanetes' intent was to increase Weber's workload to account for approximately 60% of the work, with Arvanetes performing 40% of the work plus administrative duties. **RT 28 at 9-20; 32 at 21-25; 33 at 1-25; 34 at 1-25; 35 at 1-25.** However, Weber's work load never exceeded 50% of the work load during his employment at the VAMC. **Trial Exhibit 18.**

13.     Weber testified that he was unfairly assigned an inordinate number of cases by Arvanetes, and he believed there was a conspiracy to assign extra work to him. **RT 36 at 12-25; 37 at 1-25; 38 at 1-25.** He provided one witness to support his claim, Jolene McKenzie. **RT 143 at 6-25.** However, Exhibit 18, which established that Weber's work load never exceeded 50% of the radiology cases during his employment at the VAMC, is inconsistent with and casts doubt on the testimony of both Weber and Jolene McKenzie. Other employees of the department also contradicted McKenzie's observations. **RT 333 at 7-25; 337 at 1-5; 417 at 5-22; 430 at 16-25; 431 at 1-17.**

14.     Problems with Weber's job performance surfaced soon after his employment began, and continued throughout his employment. He would not report to work on time, would not adhere to scheduled lunch hours, and was not accessible to the staff of the radiology department during work hours. Patients were scheduled for procedures commencing at 8:00 a.m. Problems for staff and the patient were created when Weber did not report to work on time. Todd Branscum, the chief technologist in the radiology department, corroborated Arvantes' observations. Branscum also testified that the department did not have the same problem with Arvanetes. **RT 64 at 9-25; 65 at 1-25; 66 at 1-3; 406 at 6-25; 407 at 1-25; 408 at 1-2.**

4

15.     Weber also engaged in unprofessional conduct toward the staff of the radiology department, i.e., saluting Arvanetes, putting his face very close to Todd Branscum's face, making an inappropriate comment to Terry Riebe related to a gun, and confronting Rob Rogge, the timekeeper, about an issue regarding annual leave. **RT 69 at 21-25; 70 at 1-5; 396 at 3-25; RT 410 at 10-18; 429 at 13-25; 430 at 1-10.**

16.     Weber denied that his work schedule caused any problems in the department. In fact, he testified that he worked long hours – more hours than what was required. **RT 183 at 16-25.** He implied that he was harassed by Arvanetes about his work schedule and work habits for no reason other than his age. **RT 183 at 2-15**. Dr. Weber also denied that he exhibited any aggressive or inappropriate behavior toward any employee. **RT 261 at 1-16.**

17.     Weber's testimony conflicts not only with Arvanetes' testimony, but also with other personnel of the radiology department and the VAMC. To the extent that the Court must make a credibility determination of Weber to resolve the conflict in testimony, the Court finds Weber not to be a credible witness.

18.     Arvanetes sought advice from the Human Resources Department, Lee Logan in particular, about how to handle Weber's job performance problems. Ms. Logan advised. Arvanetes to orally counsel Weber, to keep notes, and to document any problems. Arvanetes followed this advice. **RT 66 at 7-25; 67 at 1-25; 366 at 11-25; 367 at 1-25; Trial Exhibits 28, 29, 30, 34, 38, 39, 40, 45, 62, 63.**

19.     On January 30, 1998, Arvanetes provided a letter to Weber documenting concerns related to Weber's job performance. Arvanetes expressed dissatisfaction with Weber's inability to perform his share of the work load, with Weber's failure to adhere to the scheduled work

5

hours and lunch break, and with Weber's unprofessional, sarcastic, and insubordinate attitude.
**Trial Exhibit 29.**

20.     On February 19, 1998, Arvanetes provided a second letter to Weber related to
Weber's job performance. The letter addressed taking time off in the afternoon and the need to
communicate about taking time off. Again, this letter was necessary because Weber was not
always accessible to the staff and patients of the radiology department during work hours. **Trial
Exhibit 38.**

21.     On June 28, 1998, Todd Branscum provided a memo to Arvanetes complaining
about Weber's unprofessional attitude and its negative impact on the radiology department.
**Trial Exhibit 19.**

22.     On June 29, 1998, Arvanetes provided a letter of counseling to Weber related to
Weber's job performance. The letter addressed Weber's failure to request leave, his disruptive
behavior with staff, his lack of cooperation to ensure appropriate coverage for the department, his
inappropriate use of volunteer services; and his disrespectful conduct. **Trial Exhibit 40.**

23.     On November 26, 1998, Arvanetes provided a fourth letter to Weber related to
Weber's job performance. The letter addressed Weber's leaving town while on-call, without
making arrangements for coverage.

24.     Weber inappropriately and unprofessionally acted-out in a situation involving Dr.
Alvarez. **Trial Exhibit 40.** He confronted Dr. Alvarez about problems that he was having with
Arvanetes, and touched his finger to Dr. Alvarez's chest. **RT 124 at 21-25; 125 at 1-25; 126 at
1-3.**

6

25.    Weber acknowledges that he received the counseling letters from Arvanetes. **RT 247 at 12-25; 248 at 1-25; 249 at 1-25; 250 at 1-6; 262 at 20-25; 263-270 at 1-6.** He testified that the contents of the letters – the complaints made by Arvanetes and other employees of VAMC about his work performance and behavior – are untrue. **Id.** This testimony conflicts not only with Arvanetes' testimony, but also with other personnel of the radiology department. Again, to the extent that the Court must make a determination of Weber's credibility to resolve the conflict in testimony, the Court finds Weber to not be a credible witness.

26.    Arvanetes evaluated Weber twice during his employment at the VAMC. Weber received a low satisfactory rating for the period of 10/27/97 – 10/2/98 and an unsatisfactory rating for the period of 10/3/98 – 6/21/99. **Trial Exhibits 51 and 52.**

27.    During the Fall of 1998, a peer review mandated by policy was conducted by Arvanetes on twenty-five of Weber's cases. Weber conducted a peer review of Arvanetes' cases. The review of Weber's cases indicated possible incorrect interpretations in two cases. The cases were sent to Mountain Pacific Quality Health Foundation for an independent external review on January 11, 1999, in accordance with policy. **Trial Exhibit 104.** The external review also found problems with Weber's interpretations, agreeing with Arvanetes' findings. **Trial Exhibit 104.** As a result of these findings, and in accordance with policy, on February 10, 1999, quality management for the VAMC suggested that more cases be reviewed. **Trial Exhibit 105.** A second internal review was begun on additional cases. An additional eleven cases, MRI cases, were sent to Mountain Pacific Quality Health Foundation on May 18, 1999, for independent external review. **Trial Exhibit 106.** The results of the independent external review were returned to the VAMC by letter of June 9, 1999. The reviewer noted disagreement with some of

7

the interpretations and suggested that additional steps would have been helpful for diagnosis of the patients. **Exhibit 108; RT 39 at 22-25; 40 at 1-25; 103-107 at 1-3; 195 at 15; 200 at 1-16; 210-225; 226 at 19-25; 227-228 at 1-14; 410 at 19-25; 411-413 at 1-20.** Had Weber found any inaccuracies or errors in Arvanetes' interpretations, the same process would have been followed. **RT 78 at 8-25; 411 at 12-18.**

28.     Weber testified that he was treated unfairly by the peer review process, his chief complaint being that only MRI cases were chosen for the second round of external review. He explained that MRI is a newer procedure, and, as such, selecting only MRI cases constituted age discrimination. He testified that many radiologists of his age had chosen not to learn to interpret MRI studies. **RT 299 at 11-25.**

29.     Weber's testimony concerning the MRI procedure materially conflicted with other testimony that he gave to this Court. Weber testified that he had no concerns about his abilities with respect to MRI and, in fact, had a lot of experience in MRI and had published papers in MRI. **RT 177 at 9-21.** His assertions about the MRI procedure constituting age discrimination are wholly lacking in credibility.

30.     In addition to the concerns raised by the required peer review process, a serious incident involving Weber and a patient occurred on January 14, 1999, which raised additional concerns regarding his job performance. **RT 79 at 13-25; 80 at 1-25.** The incident involved a CT guided lung biopsy which resulted in a pneumothorax (collapsed lung). Although not a regular occurrence, a pneumothorax is not an unexpected complication of a lung biopsy. **RT 41 at 5-25; 413 at 21-25; 414-416 at 1-8; 423-426.** The patient was in distress, complaining of shortness of breath. The radiology technicians, Todd Branscum and Terry Riebe, noted that the

8

patient's color changed to gray. Both were concerned that the patient would die. Weber abandoned the patient while he was in distress, leaving Terry Riebe and Todd Branscum to handle the situation. Eventually, the situation was rectified by placement of a chest tube by a surgeon. Chest tube kits were available in the radiology department for Weber's use. In Terry Riebe's vast experience, over seventeen years as a technician, he has never been in a similar situation. In his experience, when a pneumothorax occurs, the radiologist simply inserts a chest tube. **Trial Exhibit 117.** When this type of unplanned clinical occurrence happens (abandonment of a patient), an administrative investigation of the incident is required. **RT 229 at 5-25.** This administrative investigation was completely separate and distinct from the peer review process. **RT 219 at 25; 220 at 1-14.**

      31.     Weber claimed that he suffered age discrimination by the VAMC when it convened an administrative investigation. He compared himself to other doctors, including Arvanetes and Dr. Michael Agee, who have had complications result from their work, however, none of these complications resulted in the convening of an administrative investigation. Weber misunderstands the purpose of an administrative investigation, which is to investigate an unplanned clinical occurrence, not complications or even deaths that occur if the doctor has provided treatment within the standard of care. **RT 81 at 23-25; 82 at 1-13; 229 at 19-25.** For example, a pneumothorax is not an unexpected clinical occurrence when performing a lung biopsy. **RT 80 at 2-20; 424 at 14-25.** If Weber had not abandoned the patient, an administrative hearing would not have been convened.

      32.     On March 19, 1999, a letter was hand delivered to Weber advising him that, as of March 29, 1999, he would be reassigned to administrative duty at home pending the

9

administrative investigation and pending the outcome of the continuing peer review process of his cases. **Trial Exhibit 55.** Weber believes this decision was based upon his age. To the contrary, the decision was grounded in the VAMC's concern about Weber's clinical competence given the peer review results and the pneumothorax incident.

33.     The required administrative investigation was authorized on April 13, 1999, conducted on April 22-23, 1999, and the report was issued on May 13, 1999. **Trial Exhibits 70 and 71.** The report concluded that the conduct relating to the incident at issue did not constitute grounds for dismissal. At the same time, it found that Weber may have been negligent in the acute management of the patient following the initial biopsy attempts. It also found that the interpersonal conflicts between Weber and other staff significantly compromised the delivery of services in the case. **Trial Exhibit 71.** There is no evidence that age played a role in the administrative investigation process, including the decision to empanel an administrative board.

34.     Weber testified that in April 1999, he contacted an Equal Employment Opportunity (EEO) counselor at the Office of Resolution Management in Vancouver, Washington, alleging that he had been discriminated against on the basis of age. **RT 297 at 13-25.** Weber filed a more formal complaint with the EEO, and proceedings were conducted related to that complaint after Weber was placed on administrative leave. **RT 59 at 5-12; 219 at 17-23; 432 at 4-13; 113 at 21-25; 114 at 1-4; 359 at 25; 360 at 1-3; 375 at 22-25; 376 at 1-5.** The fact that Weber engaged in EEO activity, and that this fact was known by employees and administrators at the VAMC, played no role in any of the employment decisions made by the VAMC or its employees and administrators. **RT 231 at 9-16; 360 at 22-25; 361 at 1-18; 392 at 10-25; 393 at 1-6; 417 at 23-25; 418 at 1-4; 431 at 18-25; 432 at 1-3.**

35.     Weber alleges that he was placed on administrative leave and employment decisions were made by VAMC as retaliation for him engaging in EEO activity. He attempts to support this claim of retaliation with an investigation of Dr. Alvarez for alleged retaliatory conduct in 2002, several years after Weber's termination. The Court finds this investigation of conduct that occurred after Weber's termination irrelevant to this lawsuit. Even though irrelevant, it is noteworthy that the allegations were determined to be unfounded. **RT 131 at 12-25; 132-135.**

36.     Weber was notified of the convening of a Summary Review Board ("Board") to conduct a review of his employment during his probationary period, and to make recommendations regarding his retention in or separation from employment with the VAMC. The review was prompted by the results of: (1) the peer review of Weber's cases done both in December 1998, and the follow-up reviews requested in February 1999; (2) the administrative investigation of the incident occurring in January 1999; and (3) the receipt of four letters of counseling concerning inappropriate professional conduct from October 1997, through November 1998. **RT 376 at 6-25.** The Board consisted of three physicians, Dr. Michael Agee, Dr. Kim Damrow, and Dr. Douglas Alvord. **RT 130 at 2-25.**

37.     The Board review occurred on August 2 and 6, 1999. After the hearing, on August 19, 1999, the Board recommended that Weber be separated from his employment with the VAMC during his probationary period. The Board found that "[w]hile no single event recounted to the Board or demonstrated by the evidence appears to warrant removal, taken as a whole the pattern of behavior, attitude toward correction, and erosion of staff confidence lead the Board to conclude that his retention beyond the probationary period would prohibit the effective

11

functioning of the Radiology Department." **Trial Exhibit 72.** All three members of the Board testified that the issue of age discrimination was not raised by Dr. Weber during the Board proceeding. All three members questioned Weber's credibility. Weber described the radiology department as "rosy." **RT 153 at 14-25; 154-158; 345 at 25; 346-349; Deposition of Michael Agee, M.D., Docket No. 70, at 9-14.**

38.    The Board decision was vacated and remanded for further proceedings by an Order of this Court dated June 2, 2004. The Court's decision to vacate was based upon procedural – notice – errors made by the VAMC. The Order did not comment upon the substance of the Board's decision.

39.    Weber was terminated from his probationary position effective September 13, 1999. **Trial Exhibit 92.** After this Court's Order of June 2, 2004, Weber was reinstated and placed on administrative leave as of the date of the Order.

40.    In deciding the facts, this Court has been obliged to determine credibility of witnesses, especially when issues of fact were in dispute. On the issue of credibility, the Court notes that Weber categorically denied any aggressive behavior on his part in relating to any other staff members at the VAMC. **RT 261 at 1-25; 262 at 1-7; 326 at 1-22.** This testimony was contradicted by testimony from Arvanetes, Todd Branscum, Terry Riebe, Rob Rogge, Dr. Alvarez, Dr. Damrow, and Lee Logan. Todd Branscum, Dr. Damrow, and Lee Logan, all documented incidents that they had with Weber at or near the time of the incident. **Trial Exhibits 19, 100, 300, 301.** Moreover, Weber denied that he ever asked Rob Bean, a former employee of the VAMC, to testify about alleged retaliation that he had suffered at the VAMC in order to get back at Dr. Alvarez and Lee Logan. **RT 328 at 2-25; 329 at 1-7.** This testimony

12

was contradicted by Rob Bean, who testified that Weber visited him at his office in Helena, Montana, two days before the trial, asking Mr. Bean to testify that he had suffered retaliation at the VAMC. Also, Mr. Bean testified that Weber told him it would be a way of getting back at Lee Logan and Dr. Alvarez. **RT 440 at 8-25; 441–443**. These issues of credibility, coupled with the material inconsistencies in his testimony otherwise noted in these findings, support and underscore this Court's finding that Weber is not a credible witness.

From the foregoing, the Court enters its:

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the claim alleged in count one under the Age Discrimination in Employment Act (hereafter ADEA), 29 U.S.C. § 621, *et. seq.*, pursuant to 28 U.S.C. § 1331.

2. This case is properly venued in the Helena Division of the United States District Court for the District of Montana by 28 U.S.C. §1391(e)(2).

3. The Department of Veterans' Affairs is an executive agency as defined in Section 105 of Title 5, United States Code, and is subject to the provisions of the ADEA, 29 U.S.C. § 633a(a).

4. Defendant James B. Peake, M.D., the Secretary of the Department of Veterans Affairs, is the only proper defendant in this action. Romain v. Shear, 799 F.2d 1416, 1418 (9th Cir. 1986).

5. Weber brought this action claiming age discrimination in violation of the ADEA. He advances three theories of liability: (1) disparate treatment; (2) hostile work environment; and (3) retaliation.

6. The legal framework for determining whether Weber met his burden of establishing age discrimination is the familiar burden shifting analysis set out in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Pottenger v. Potlach Corp., 329 F.3d 740, 745 (9th Cir. 2003). Weber must first establish a prima facie case on the theories of liability that he advances. Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 658 (9th Cir. 2002). If Weber meets his burden of establishing a prima facie case of age discrimination, the burden then shifts to the Secretary to articulate a "legitimate, nondiscriminatory reason" for his actions. Wallis v. J. R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). If the Secretary meets this burden, Weber will then be able to prevail only if he can prove by a preponderance of the evidence that the Secretary's stated reasons were pretext for discrimination. Id. At all times, the ultimate burden of showing that the Secretary discriminated against him is with Weber. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983).

7. To establish a prima facie case of age discrimination in violation of the ADEA, under a disparate treatment theory, Weber must establish the following: (1) that he was at least 40 at the relevant time; (2) that he was performing his job satisfactorily; (3) that he was discharged; and (4) that he was replaced by a "substantially younger" employee with equal or inferior qualifications. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1280-81 (9th Cir. 2000).

8. Weber has failed to present sufficient evidence to establish a prima facie case. Weber was over 40 years old during the relevant time, and he was discharged by the VAMC, but he has completely failed to present any evidence that he was satisfactorily performing his job and that he was replaced by a "substantially younger" employee. To the contrary, Weber's performance at the VAMC was replete with performance problems including inaccuracies in his work

14

discovered by Arvanetes and confirmed by external and independent peer reviewers. His performance in abandoning a patient while conducting a lung biopsy resulted in a finding that he may have been negligent in his work performance. And, even though the recommendation was not for immediate termination, this occurrence, when coupled with the incident, contradicts any claim made by Weber that his performance was satisfactory. There is also evidence in the record of Weber's shoddy work habits and unprofessional conduct. Finally, there is no evidence in the record that the doctor replacing Weber after his discharge was a "substantially younger" radiologist. He has failed to present sufficient evidence on two of the four required factors. The Court concludes that Weber failed to make out a prima facie case of age discrimination under a disparate treatment theory.

9. Even if Weber had presented evidence sufficient to establish all four elements, which he did not, VAMC presented ample legitimate reasons for Weber's discharge. There is no credible evidence in this record that ties any of the decisions of the VAMC to Weber's age. The peer review process and administrative investigation process were conducted in accordance with the quality assurance policies in place at VAMC. Notably, the three physicians comprising the Board unanimously testified that Weber failed to mention anything about age discrimination during his testimony before the Board. All three testified that their decision to discharge Weber had nothing to do with his age.

10. Weber also has failed to prove by preponderant evidence that the VAMC's stated reasons for its actions and Weber's ultimate discharge were pretextual. Weber lacks credibility as a witness because of the material inconsistencies noted in his testimony and because the evidence

15

that he presented, even if it be said to have supported his allegations, was outweighed by
contradictory evidence presented by the VAMC.

11. To establish a prima facie case of age discrimination in violation of the ADEA under
a hostile work environment theory, Weber must establish the following: (1) that he was subjected
to verbal or physical conduct of an age-related nature; (2) that the conduct was unwelcome; and
(3) that the conduct was sufficiently severe to alter the conditions of his employment and create
an abusive work environment. Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).

12. Again, Weber has testified that he suffered from a hostile work environment and, it is
true, that there was a conflict between Weber and his supervisor, Arvanetes. However, Weber
completely failed to present any evidence that the conflict was in any way based upon his age.
To the contrary, Weber's work performance and attitude contributed greatly to the tension in the
radiology department. Additionally, his unprofessional attitude and behavior was also exhibited
to and directed at other personnel of the VAMC not in the radiology department. Weber denied
that he had ever engaged in any aggressive or unprofessional behavior. This testimony is
incredible given the sheer number of witnesses presented by the VAMC that directly contradict
this testimony. Weber is simply not a credible witness, and his allegations are insufficient to
establish a prima facie case under a theory of hostile work environment.

13. Even if Weber had made out a sufficient case, the VAMC has again provided
legitimate reasons for every action taken and for Weber's ultimate discharge. Neither the
disciplinary actions taken against Weber, nor the peer review process used during his tenure,
were grounded in Weber's age. The discipline, in fact, was necessitated by Weber's conduct.

The peer review process was triggered by his work performance. The reasons advanced by the VAMC are not pretextual but are supported by credible evidence.

14. To establish a prima facie case of retaliation Weber must establish: (1) that he participated in protected activity; (2) that the Secretary was aware of his protected activity; (3) that, subsequently, he was subject to adverse treatment by the Secretary; and (4) that a nexus exists between the protected activity and the adverse treatment. Kortan v. California Youth Authority, 217 F.3d 1104, 1112 (9th Cir. 2000), quoting, Steiner v. Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir. 1994).

15. Weber failed to present sufficient evidence to establish a prima facie case of retaliation. Although the record is unclear about the exact date that the VAMC personnel became aware of Weber's informal and or formal EEO activity, most, if not all, of the VAMC witnesses who testified at trial acknowledged that they knew about Weber's EEO complaint. And, it is also undisputed that at least the Board convened and rendered its decision after the VAMC became aware of the complaint. Weber fails in his proof, however, of a nexus between the EEO activity and the adverse treatment. Timing is not enough. Nexus means connection – Weber must establish that there is some connection between his filing of an EEO complaint and any adverse treatment. He failed to do so.

16. The disciplinary letters were sent and the peer review process began well before Weber informally contacted an EEO counselor and well before he filed an EEO complaint. The peer review process continued past the filing of the complaint, but was necessitated by the findings of the external reviewers who confirmed Arvanetes' findings and found inconsistencies and errors in Weber's work. Weber's claim that the selection of MRI cases for the second round

17

of peer review was an act of retaliation is baseless. Weber confirmed in his testimony (and Arvanetes corroborated this testimony) that he knew he was expected to perform MRIs and that he had assured the VAMC that he could perform MRIs. In fact, early on in his testimony, he touted himself as an expert in MRI – "No problem. As I said, I published some papers in MRI. . . . So, I had a lot of experience in MRI." **RT 177 at 10-21.** However, perhaps in an attempt to excuse errors in his MRI cases that were found by the external independent reviewers, he explained that reviewing his MRI cases constituted age discrimination because "[i]n the field of radiology, many physicians that are my age or in my generation, have chosen not to learn to interpret MRI studies." **RT 299 at 13-14.** Although these statements are not directly contradictory, they convey a vastly different message. **RT 177 at 10-21; 299 at 7-25; 300 at 1-25; 301 at 1-6.**

17. The administrative hearing predated any EEO activity and was required by policy because abandoning a patient is outside of the standard of care. The Board did follow Weber's EEO activity, but the timing of it again has a neutral explanation. Weber was a probationary employee on a two-year term, due to expire in the Fall of 1999. Also, the Board was convened because of conduct on the part of Weber that occurred prior to his EEO activity.

18. Weber has failed to establish a prima facie case for retaliation. He has not presented evidence establishing a nexus between his EEO activity and employment decisions and actions taken by the VAMC. Moreover, VAMC provided legitimate reasons for every action taken – reasons independent of his EEO activity and based in part on the expiration date of his probationary term of employment.

18

19. Weber has failed to prove by a preponderance of evidence that VAMC's stated reasons were a pretext for discrimination. As noted, Weber lacks credibility and he failed to present any evidence to prove retaliation. His after-the-fact evidence pertaining to the investigation of Dr. Alvarez for retaliation, in 2002, is irrelevant and does not prove pretext. His attempt to secure a witness, the day before trial, to testify that he was retaliated against by the VAMC, and then his denial of this attempt, again affects the ability of this Court to give any weight to any testimony or evidence that he presented.

20. In sum, the evidence presented at trial failed to establish that acts or omissions of the VAMC amounted to age discrimination, hostile work environment, or retaliation under the ADEA. The Secretary of the Department of Veterans' Affairs, James B. Peake, M. D., is entitled to judgment dismissing the third-amended complaint.

### ORDER

1. Plaintiff's third-amended complaint is DISMISSED with prejudice.

2. The Clerk of Court is ordered to enter judgment in favor of the defendant.

DATED this ___7th___ day of August, 2008.

SAM E. HADDON
U.S. District Judge

19